

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-25-2005

# Gilles v. Davis

Precedential or Non-Precedential: Precedential

Docket No. 04-2542

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Gilles v. Davis" (2005). *2005 Decisions.* Paper 288.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/288

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 04-2542

_____

JAMES G. GILLES; TIMOTHY PETIT
                                        Appellants

v.

SERGEANT GREGORY DAVIS,
Indiana University Police Department;
OFFICER CHRISTOPHER D. GOENNER,
Indiana University Police Department;
TERRY APPOLONIA, Director, Student Life,
Indiana University of Pennsylvania;
RHONDA H. LUCKEY, ED.D., Associate President of
Student Affairs for Indiana University of Pennsylvania;
WILLIAM MONTGOMERY, Director of Public Safety,
Indiana University of Pennsylvania

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. Civil Action No. 03-cv-00529
(Honorable Arthur J. Schwab)

Argued March 8, 2005

Before:  SCIRICA, *Chief Judge*,
ROTH and FUENTES, *Circuit Judges*

(Filed October 25, 2005)

J. MICHAEL CONSIDINE, JR., ESQUIRE (ARGUED)
12 East Barnard Street, Suite 100
West Chester, Pennsylvania 19382
        Attorney for Appellants

GREGORY R. NEUHAUSER, ESQUIRE (ARGUED)
SARAH C. YERGER, ESQUIRE
Office of Attorney General of Pennsylvania
15th Floor, Strawberry Square
Harrisburg, Pennsylvania 17120
        Attorneys for Appellees

OPINION OF THE COURT

SCIRICA, *Chief Judge*.

In this civil rights action for damages under 42 U.S.C. § 1983, plaintiffs were arrested for disorderly conduct on the

campus of Indiana University of Pennsylvania, a state university. At issue in this First Amendment suit is whether the arresting officers are entitled to qualified immunity. Also at issue is whether resolution of a criminal charge under Pennsylvania's "Accelerated Rehabilitative Disposition" program bars a subsequent § 1983 claim. The District Court granted defendants summary judgment on all claims. We will affirm.

## I.

Although with no formal religious training, James Gilles is a self-styled "campus-evangelist" who has appeared at college campuses across the country since 1982. He preaches against what he calls the "big four"—"drugs, sex, booze, and rock and roll."

Around noon, October 5, 2001, Gilles appeared and began preaching in the open air at the Oak Grove, a busy area open to the public on the campus of Indiana University of Pennsylvania. With him were some twenty-five members of the "Campus Ministry,"[1] including Timothy Petit, with a video-camera. Gilles preached on the evils of pre-marital sex,

---

[1] According to Gilles' deposition, the Campus Ministry is his "business" and sole source of employment. He states that it is a sole proprietorship, not a non-profit entity.

drinking, and homosexuality. The District Court estimated a crowd of 75-100 students gathered.[2]

In a provocative manner, Gilles accosted the crowd, preaching that Indiana University of Pennsylvania's student body was full of "fornicators," "whores," "drunken little devils," "drunkards," and "drugs, sex, booze, and rock and roll freaks." His speech and manner drew reactions from the students. One threw an apple core at Gilles. Another shouted "get your fucking God off our campus." This set off some name-calling. Gilles asked the man if he was a communist, which drew the retort, "you're a small minded man." Gilles called another a "high school flunky." When someone approached to tell Gilles he was interrupting classes, Gilles called him "cigarette breath." The man responded, "don't be belittling me. It is Goddamn campus policy . . . You will not preach while classes are in session." Gilles retorted, "oh yes I will, devil."

The crowd became more animated in response to Gilles' invective against homosexuals. Gilles cautioned the students to "watch out [because] the homosexuals are after you on this campus" and pronounced that "nothing is lower than a lesbian." Gilles warned that "homosexuals and lesbians are headed for hell" and that "there is no such thing as a Christian lesbian . . .

---

[2]We recount the events in the light most favorable to the non-moving party. In this case, one of the plaintiffs videotaped the incident. The parties do not dispute its accuracy and we rely upon it.

[or] Christian homosexual." One woman volunteered that she was a Christian lesbian. Gilles took a pejorative tone, taunting, "oh, my, you ma'am are most confused. She thinks she's a Christian lesbo. She's a lesbian for Jesus." Gilles asked the woman, "do you lay down with dogs? Are you a bestiality lover? . . . Can you be a bestiality lover and a Christian also?" This engendered angry responses from the crowd, including one who shouted at Gilles, "I don't know, ask your mom."

Apparently, someone called the campus police, and Sergeant Gregory Davis and Officer Christopher Goenner of the Indiana University of Pennsylvania police force responded to the reported "near riot taking place." Davis heard Gilles call one person a "lesbian" and "homosexual" and said that some members of the crowd complained to him that Gilles was singling out individuals, calling them names. After Davis approached Gilles and had a brief conversation, he arrested Gilles for disorderly conduct, among other charges. Davis handcuffed Gilles and escorted him to the police car.

Davis transported Gilles to Indiana University of Pennsylvania's Department of Public Safety building, where he was held for three to four hours. Gilles contends he complained that the handcuffs were too tight and were not removed for a few hours. He never sought out a physician for treatment.

Gilles was charged with disorderly conduct, failure of disorderly persons to disperse, defiant trespass, riot and violating Pennsylvania's Wiretap Act (he had recorded

5

the incident with the police using a dictaphone hidden in his pocket). He was taken to the Indiana County Correctional Facility. Four days later on October 9, 2001, he posted a $5,000 bond and was released.[3]

Timothy Petit, who videotaped Gilles' activity, was also arrested. Officer Goenner confiscated his video-camera at the direction of Officer Davis. Petit was charged with resisting arrest, disorderly conduct, and failure of disorderly persons to disperse, and was released from custody later that day. Petit entered into the "Accelerated Rehabilitative Disposition" ("ARD") program, which permits expungement of the criminal record upon successful completion of a probationary term.

After the arrests, Bradley Hoffman, a member of Campus Ministry, inquired with the university about obtaining a solicitation permit. Hoffman submitted a "Request/Permit for Use of Campus Space for Soliciation" to "pass [] out Gospel Tracts" and "shar[e] . . . the Gospel." The permit was rejected by Terry Appolonia, the director of the Center for Student Life. An e-mail from Appolonia's supervisor, Rhonda Luckey

---

[3]Under the Pennsylvania Rules of Criminal Procedure, ten percent of the bond amount may be sufficient for release. Pa. R. Crim. P. 528(c) ("After determining the amount of the monetary condition, the bail authority may permit the deposit of a sum of money not to exceed 10% of the full amount of the monetary condition if he or she determines that such a deposit is sufficient to ensure the defendant's appearance and compliance.").

(Associate President of Student Affairs), advised that she had "grave concerns" about the behavior of the group given the earlier incident.

At a preliminary hearing on November 28, 2001, a District Justice held Gilles on the charges of disorderly conduct, failure of disorderly person to disperse, disorderly conduct and defiant trespass. The charges of riot and violating the Pennsylvania Wiretap Act were dismissed. On December 27, 2002, the Court of Common Pleas of Indiana County, Pennsylvania, granted Gilles' petition for a writ of habeas corpus and dismissed all the remaining criminal charges.

Gilles brought the following claims under § 1983: (1) malicious prosecution against Sergeant Davis, (2) false arrest against Sergeant Davis, and (3) excessive force against Sergeant Davis, based on Gilles' assertion that the handcuffs were unnecessarily tight. Gilles and Petit brought these claims under § 1983: (1) First Amendment violations by Officers Davis and Goenner, (2) First Amendment violations by Appolonia and Luckey, claiming Indiana University of Pennsylvania's permit policy was viewpoint based and standardless, vesting unbridled discretion in Appolonia and Luckey, and (3) First Amendment violation by William Montgomery, the Director of Public Safety who supervises the Indiana University of Pennsylvania police department, for failure to train and monitor police and officials charged with permit decision making. Gilles and Petit requested a declaratory judgment that Indiana University of Pennsylvania's permit policy is in violation of the First

Amendment. In addition, Gilles and Petit sought punitive damages against Sergeant Davis and a state-law replevin for return of the confiscated videotape.

The District Court granted defendants summary judgment on all claims, and declined to exercise supplemental jurisdiction over the remaining state law replevin claim.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291. The standard of review is plenary over a grant of a motion for summary judgment. *Camiolo v. State Farm Fire & Cas. Co.*, 334 F.3d 345, 354 (3d Cir. 2003) (internal citations omitted). The District Court's grant of summary judgment in favor of the appellees will be affirmed if it appears that "there is no genuine issue as to any material fact and that they are entitled to a judgment as a matter of law." *Id*.

## III.

A. Gilles' Claims

    1. First Amendment

With respect to Gilles' malicious prosecution, false arrest, and First Amendment claims, the District Court held that Sergeant Davis was entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (internal quotations omitted). In determining qualified immunity, we first ask whether "the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). If so, we then ask whether it "would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Whether it would have been clear to a reasonable officer that probable cause justified the arrest requires an examination of the crime at issue, disorderly conduct. Gilles was charged with disorderly conduct under Pennsylvania Criminal Code, 18 Pa. C.S. § 5503(a). The statute provides:

> (a) Offense defined. – A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
>> (1) engages in fighting or threatening, or in violent or tumultuous behavior;

9

(2) makes unreasonable noise;
(3) uses obscene language, or makes an obscene gesture; or
(4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

Under the statute, whether "words or acts rise to the level of disorderly conduct hinges upon whether they cause or unjustifiably risk a public disturbance." *Commonwealth v. Hock*, 728 A.2d 943, 946 (Pa. 1999). When the regulated conduct consists of speech, however, the statute must "be carefully drawn or authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003) (quoting *Gooding v. Wilson,* 405 U.S. 518, 522 (1972)); *Commonwealth v. Mastrangelo*, 414 A.2d 54, 58 (Pa. 1980) ("disorderly conduct statute may not be used to punish anyone exercising a protected First Amendment right"). Speech that does not receive First Amendment protection, in turn, "include[s] the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words[.]" *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

Under the first step of the qualified immunity analysis, the issue is whether Davis' conduct violated Gilles' First

Amendment rights.[4]  The District Court held Gilles' speech constituted "fighting words," "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace."  Mem. Op. at *13-15 (W.D. Pa. Apr. 22, 2004) (quoting *Chaplinsky*, 315 U.S. at 571-72);[5] *see also Texas v.*

---

[4]Whether Gilles' speech was protected depends, in part, on whether he had a right to speak at the Oak Grove.  We do not believe Indiana University of Pennsylvania's solicitation policy required Gilles to obtain permission or approval to use the Oak Grove area.  Regarding "public outdoor areas," which on this record appears to include the Oak Grove area, the policy states, "[a]ll activities involving commercial solicitation and/or fund-raising for noncommercial purposes in public outdoor areas must be requested and approved a minimum of ten days in advance by the Center for Student Life."  Gilles' conduct does not constitute commercial solicitation or fund-raising for noncommercial purposes.  This conclusion finds support in the deposition of Terry Appolonia, the Director of the Center for Student Life in charge of granting and denying solicitation requests.  Appolonia conceded that "[t]he policy does not state an application is needed for noncommercial activities in outdoor locations."

[5]Applying this standard, the Pennsylvania Supreme Court held that a disorderly conduct conviction did not run afoul of the First Amendment where the criminal defendant had followed a meter maid for two consecutive days, shouting vulgarities at her

*Johnson*, 491 U.S. 397, 409 (1989) ("To be punishable, words must do more than bother the listener; they must be nothing less than an invitation to exchange fisticuffs.") (quoting *Chaplinsky*, 315 U.S. at 572-73). Put another way, fighting words are "likely to provoke the average person to retaliation, and thereby cause a breach of the peace." *Texas v. Johnson*, 491 U.S. at 409 (quoting *Chaplinsky*, 315 U.S. at 574).

We believe that much of Gilles' speech was protected under the First Amendment. Crucial to this determination is that we view the facts in the light most favorable to Gilles (the non-moving party) under the summary judgment standard and the first prong of the qualified immunity analysis.

Of Gilles' questionable speech, some was derogatory language generically directed to the crowd (*e.g.*, "by definition, there are thousands of fornicators on this campus," "drunkards are everywhere on this campus"). This type of language, when not personally directed at a particular member of the audience, is not likely to incite an immediate breach of the peace. *See Cohen v. California*, 403 U.S. 15, 20 (1971) (noting that fighting words are "personally abusive epithets . . . directed to the person of the hearer") (internal quotations omitted). Gilles also specifically directed insults to certain people ("cigarette

in a threatening manner. *Mastangelo*, 414 A.2d at 58. But a disorderly conduct conviction was not appropriate for a non-threatening, profane remark directed at a police officer. *Hock*, 728 A.2d at 947.

breath," "devil," "communist," *etc.*). But on summary judgment, at least, we believe this speech in this context could be reasonably viewed as unpleasant but petty, and not sufficiently provocative to constitute fighting words. It bears noting that the videotape reveals that Gilles' speech and manner were in part and to some degree lacking in bite. For example, Gilles stated that "every Mormon is damned to hell," but added a comical overtone by finishing the sentence, "including, Donnie and Maria Osmond." His manner varied between hostile and jaunty, and sometimes exuded an air of theatrical exaggeration (*e.g.*, Gilles emphasized a point by fully extending his arms in front of him towards the sky, projecting his voice as one might do in a play).

Nonetheless, Gilles' epithets directed at the woman who identified herself as a Christian and a lesbian ("Christian lesbo," "lesbian for Jesus," "do you lay down with dogs," "are you a bestiality lover") were especially abusive and constituted fighting words. Where part of speech constitutes fighting words, the police may arrest for disorderly conduct even though other parts of the speech may be less provocative. *See, e.g.*, *Ovadal v. City of Madison, Wisconsin*, 416 F.3d 531, 535 (7th Cir. 2005) ("conduct which is in fact disorderly is not insulated because it is perpetrated while engaged in a protest demonstration") (internal quotations omitted).

Even if the lesbian/bestiality invectives did not constitute fighting words, we believe Sergeant Davis is entitled to qualified immunity. Under the second step of the analysis, a

13

police officer is entitled to qualified immunity unless it would have been clear to a reasonable officer there was no probable cause to arrest. *See Paff v. Kaltenbach*, 204 F.3d 425, 437 (3d Cir. 2000) ("If there are cases that would make it apparent to a reasonable officer in [the arresting officer's] position that probable cause was lacking, qualified immunity is not available.") (internal quotations omitted); *see also Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004) ("whether there was any reasonable basis to suppose there was probable cause . . . is the test for qualified immunity").

Gilles' speech was rude, mocking, confrontational, and insulting.[6] When viewed on the videotape, the crowd responses

---

[6]As noted, in addition to reviling the student body in general, Gilles initiated and exchanged insults with individual students. As noted, he asked one person if he was a communist and another if he was a "high school flunky." When told he was interrupting class, Gilles called the interlocutor "cigarette breath" and "devil." The crowd's reaction varied, but included some notably hostile reactions. An unidentified person threw an apple core at Gilles, striking his briefcase. Two other persons shouted at Gilles, "get your fucking God off our campus" and "[you're a] small minded man." There was a confrontation with the person Gilles called "cigarette breath," who, upset, approached Gilles up close, saying, "who are you, brown tie, and ugly pants? Don't be belittling me. It is Goddamn campus policy."

14

span the spectrum from pettiness to genuine hostility. Many in the crowd were upset and angry with Gilles at the time Officer Davis intervened.

The words Gilles directed at the woman who identified herself as a Christian and a lesbian were abusive, akin to a racial slur. For a police officer confronting Gilles in the field, with little time to parse Gilles' speech, it was not unreasonable to believe Gilles engaged in disorderly conduct.

At the least, reasonable minds could disagree whether Gilles' speech was protected. Subsequent to his arrest, the Court of Common Pleas dismissed all charges against Gilles, including the charge of disorderly conduct. Yet, Gilles has been convicted before for similar conduct. In a factually similar incident, the Indiana Court of Appeals upheld a disorderly conduct conviction for preaching to a crowd at a festival. *See Gilles v. Indiana*, 531 N.E.2d 220, 222-23 (Ind. App. 4 Dist. 1988). Holding it was "readily apparent" that Gilles used fighting words, the court focused on his use of the words "whores," "queers," "AIDS people," "drunkards," and "scum of the earth." The court reasoned that "Gilles placed his listeners in categories defined by sexual activity, sexual orientation, and sexually transmitted disease. This language was inherently likely to provoke a violent reaction." *Id.* at 223. In any event, that there is more than one judicial view of Gilles' conduct strongly suggests that qualified immunity is appropriate here.

Finally, whether it was reasonable to believe there was probable cause is in part based on the limited information that the arresting officer has at the time. *See BeVier v. Hucal*, 806 F.2d 123, 127 (7th Cir. 1986) ("probable cause is a function of information and exigency"); *Colbert v. Angstadt*, 169 F. Supp. 2d 352, 360-61 (E.D. Pa. 2001) (holding probable cause to arrest existed where the facts and circumstances within the arresting officer's knowledge were sufficient for a reasonable person to believe that an offense had been committed). Sergeant Davis appears to have arrived at the scene fifteen to twenty minutes after Gilles began to speak. According to Davis, he was summoned to a "near riot situation." He briefly spoke with members of the crowd about what had transpired. According to Davis, members of the crowd reported to him that "Gilles was . . . picking people out of the crowd individually and calling them names and questioning their sexual identity, questioning their sexual orientation." We see no reason why Davis' reliance on their accounts was unreasonable.

Taking account of the entire episode and the information Davis possessed at the time, we hold Davis is entitled to qualified immunity because it would not have been clear to a reasonable officer that Gilles did not engage in disorderly conduct.[7] While the Court of Common Pleas held Gilles'

_____

[7]In addition to holding Sergeant Davis is entitled to qualified immunity, we hold Gilles's and Petit's First Amendment claim fails against William Montgomery, the Director of Public Safety

16

speech was insufficient to constitute disorderly conduct, it does not necessarily follow that the arresting officers are civilly liable for the arrest. Qualified immunity encompasses mistaken judgments that are not plainly incompetent. *Hunter v. Bryant,* 502 U.S. 224, 229 (1991). Under qualified immunity, police officers are entitled to a certain amount of deference for decisions they make in the field. They must make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Saucier v. Katz*, 533 U.S. 194, 204-05

---

who supervises the Indiana University of Pennsylvania police department. A supervising authority may be liable under § 1983 for failing to train police officers when the failure to train demonstrates deliberate indifference to the constitutional rights of those with whom the officers may come into contact, notwithstanding the qualified immunity of an officer at the scene. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). But to establish liability on a failure to train claim under § 1983, plaintiffs "must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). Gilles and Petit have not pled the necessary elements to state a claim against Montgomery for failure to train the officers of the Indiana University of Pennsylvania police department. Accordingly, their claim against Montgomery fails.

17

(2001). The reasonableness of the officer's belief should be judged from that on-scene perspective, not with the perfect vision of hindsight. *Id.*; *see also Graves v. City of Coeur D'Alene*, 339 F.3d 828, 848 n.25 (9th Cir. 2003) ("The qualified immunity defense recognizes that officers make probable cause assessments in the field under pressure and therefore affords the officer leeway, permitting a reasonable mistake without resulting individual liability of the officer, when the law is not clearly established.")

2. Excessive Force

The District Court granted summary judgment to defendants on Gilles' excessive force claim that his handcuffs were too tight. In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, "after resolving all factual disputes in favor of the plaintiff, [] the officer's use of force was objectively reasonable under the circumstances." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (internal quotations omitted). In *Kopec*, we reversed the grant of summary judgment, but cautioned that the "opinion should not be overread as we do not intend to open the floodgates to a torrent of handcuff claims." *Id.* The plaintiff in *Kopec* contended he was in extreme pain, which would have been obvious to the arresting officer. In addition to repeated complaints about the pain, the plaintiff allegedly fell to the ground and "began to faint." *Id.* Furthermore, the plaintiff alleged permanent nerve damage in one wrist, for which a surgeon treated him for over one year. *Id.* at 774.

18

Gilles contends that two matters should have alerted Davis to his alleged pain. First, he notes that he loudly sang religious songs while in custody, in part, he says, to take his mind off of the pain. Even if true, it is not necessarily objectively reasonable to deduce from Gilles' singing that the handcuffs were causing him pain. Furthermore, Gilles testified that the purpose of his singing was "primarily to rejoice in the fact that I was being persecuted for righteousness' sake for preaching the Gospel." Second, Gilles contends he complained of pain to unidentified officers who allegedly passed the information to Davis, who allegedly instructed them not to adjust the handcuffs. Unlike *Kopec*, where the plaintiff fell to the ground and fainted with pain, obvious visible indicators of Gilles' pain were absent (other than his alleged complaint that the handcuffs were too tight). As the District Court noted on viewing the videotape of the arrest, Gilles demonstrated no expression or signs of discomfort at the time he was handcuffed. Nor did Gilles seek or receive medical treatment after the fact. The only doctor Gilles ever saw relating to this incident was on April 13, 2004, two and a half years after the arrest. At that time, Gilles did not seek medical treatment, but rather an "independent medical evaluation." The plaintiff in *Kopec* alleged permanent nerve damage for which a hand-surgeon had treated him for over a year. In this case, we hold the facts alleged constitute insufficient evidence as a matter of law for excessive force by handcuffing.

### 3. Standing

Gilles and Petit contend the Indiana University of Pennsylvania permit or registration policy and its application by Appolonia and Luckey violated their First Amendment rights. The District Court held Gilles and Petit had no standing to bring the challenge because they had not applied for a permit.

The traditional rules of standing require that the plaintiff has suffered an "injury in fact," which is "concrete and particularized" and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The District Court held plaintiffs failed to show they personally suffered some actual or threatened injury as a result of Indiana University of Pennsylvania's permit policy or the application of that policy. As the District Court found, Gilles and Petit never applied for nor were they denied a permit. Gilles and Petit appear to argue that Bradley Hoffman's after the fact application confers standing on them. The argument is meritless.

Under a First Amendment exception to the traditional standing rules, litigants "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma,* 413 U.S. 601, 612 (1973). This exception is inapplicable to Gilles and Petit. The policy they challenge does not unduly restrict First Amendment freedoms,

20

nor does it deter third parties from engaging in protected expression. By its terms, it merely allows the university to "regulate the time, manner, and location of any and all solicitation activities on campus" so as to ensure such activities do not "create undue noise or disruption or interfere with the activities that normally occur in the area in question." Accordingly, we hold Gilles and Petit lack standing to challenge the permit policy.

B. Petit's Claims

Timothy Petit sought damages under § 1983 against Sergeant Davis, Officer Goenner, Indiana University of Pennsylvania administrators Appolonia and Luckey, and William Montgomery, the Director of Public Safety who supervises the Indiana University of Pennsylvania police department. The District Court held that Petit's claims were barred under *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck*, a § 1983 action that impugns the validity of the plaintiff's underlying conviction cannot be maintained unless the conviction has been reversed on direct appeal or impaired by collateral proceedings. As the District Court noted, Petit resolved the charges against him by entering into Pennsylvania's Accelerated Rehabilitation Disposition program.[8] After a

_____

[8]At his deposition, Petit stated he pled guilty to disorderly conduct and that he never appealed that "conviction." Despite Petit's characterization, the District Court and the parties state that Petit entered into the ARD program. As we discuss, under

21

successful probationary period, the charges were expunged from his criminal record. The District Court found, however, that under *Heck* expungement under the ARD Program is not a result "favorable" to the plaintiff.

When a criminal defendant is selected for and decides to participate in the ARD program, he avoids trial and potential jail time, and receives expungement of the record in exchange for successfully completing a probationary period. *See generally* Pa. R. Crim. P. 300 *et seq*.; *Junod v. Bader*, 458 A.2d 251, 253-54 (Pa. Super. Ct. 1983).[9] The Comment to Rule 312 of the

*Heck*, both a guilty plea and an ARD are sufficient to bar a subsequent § 1983 claim.

[9]The purpose of the ARD program is to rehabilitate offenders and promptly dispose of minor criminal charges. *See* Pa. Crim. R. 300-20 & Committee Introduction. The program targets first time offenders charged with minor crimes that appear receptive to treatment and rehabilitation. District attorneys administer the ARD program and have discretion whether to request the court to grant it for a given defendant. *Commonwealth v. Armstrong,* 434 A.2d 1205 (Pa. 1981). Admission into ARD is not a right. *Commonwealth v. Paul,* 557 A.2d 357, 358 (1989). But prosecutors do not have unbridled discretion whether to grant or deny the program. *Commonwealth v. Lutz,* 495 A.2d 928, 935 (1985). *See generally Cain v. Darby Borough*, 7 F.3d 377, 382 (3d Cir. 1993) (en banc).

22

Pennsylvania Rules of Criminal Procedure states that "acceptance into an ARD program is not intended to constitute a conviction," but "it may be statutorily construed as a conviction for purposes of computing sentences on subsequent convictions." Pa. R. Crim. P. 312 (Comment). By entering the ARD program, the defendant waives his right to prove his innocence, but at the same time, does not admit guilt.

As *Heck* noted, § 1983 "creates a species of tort liability." 512 U.S. at 483. Thus, common law bars to suit apply to claims brought under § 1983. *Id.* In *Heck*, the Court held a §1983 malicious prosecution claim was subject to the common law requirement that the plaintiff show the prior criminal proceeding terminated in his favor. *Id.* at 484. The purpose of the requirement, the Court explained, is to avoid parallel litigation of probable cause and guilt. *Id.* It also prevents the claimant from succeeding in a tort action after having been convicted in the underlying criminal prosecution, which would run counter to the judicial policy against creating two conflicting resolutions arising from the same transaction. *Id.*

These reasons are equally applicable in this context. Petit's underlying disorderly conduct charge and his § 1983 First Amendment claim require answering the same question—whether Petit's behavior constituted protected activity or disorderly conduct. If ARD does not constitute a favorable termination, success in the § 1983 claim would result in parallel litigation over whether Petit's activity constituted

disorderly conduct and could result in a conflicting resolution arising from the same conduct.

We recognize that concurring and dissenting opinions in *Spencer v. Kemna*, 523 U.S. 1 (1998), question the applicability of *Heck* to an individual, such as Petit, who has no recourse under the habeas statute. *See id.* at 19-20 (Souter, J., concurring); *id.* at 21 (Ginsburg, J., concurring); *id.* at 25 n.8 (Stevens, J., dissenting). But these opinions do not affect our conclusion that *Heck* applies to Petit's claims. We doubt that *Heck* has been undermined, but to the extent its continued validity has been called into question, we join on this point, our sister courts of appeals for the First and Fifth Circuits in following the Supreme Court's admonition "to lower federal courts to follow its directly applicable precedent, even if that precedent appears weakened by pronouncements in its subsequent decisions, and to leave to the Court 'the prerogative of overruling its own decisions.'" *Figuero v. Rivera,* 147 F.3d 77, 81 n.3 (1st Cir. 1998) (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1989)); *see Randell v. Johnson*, 227 F.3d 300, 301-02 (5th Cir. 2000).

Because the holding of *Heck* applies*,* Petit cannot maintain a § 1983 claim unless successful completion of the ARD program constitutes a "termination of the prior criminal proceeding in favor of the accused." *Heck*, 512 U.S. at 485. We

24

have not had occasion to address this issue directly.[10] Our trial

---

[10]In *Cain v. Darby Borough*, 7 F.3d 377 (3d Cir. 1993), decided before *Heck v. Humphrey*, we examined the validity of coupling the ARD program with a mandatory release of civil rights claims. Under a policy of the Delaware County District Attorney's Office, the District Attorney would not approve the ARD program unless the petitioner first agreed to a release of all civil rights claims against the arresting officers. In *Cain*, the petitioner agreed to this waiver, but after successfully completing the program, she brought a § 1983 suit against three municipalities, the respective police departments, and arresting officers. We held that the release agreement was unenforceable under *Town of Newton v. Rumery,* 480 U.S. 386 (1987). Under *Rumery*, an agreement releasing § 1983 claims would be unenforceable "if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Id.* at 392. We held that the Delaware County blanket policy of requiring release of § 1983 claims failed *Rumery* because it did not "distinguish between frivolous and meritorious litigation," indiscriminately curtailing both. We stated: "[w]hile ARD was designed in part to promptly dispose of minor *criminal* charges, thus eliminating the need for costly and time-consuming criminal trials, it was never intended to dispose of *civil rights* claims." But *Cain* was decided before *Heck v. Humphrey* and did not consider whether ARD was a favorable termination of the criminal charge sufficient to bring a § 1983 claim.

25

courts have held that ARD is not a termination favorable for purposes of bringing a subsequent § 1983 malicious prosecution claim.[11]

We find instructive opinions from the Second and Fifth Circuits that have addressed whether similar pre-trial probationary programs are a favorable termination sufficient to bring a subsequent civil suit. In *Roesch v. Otarola*, 980 F.2d 850 (2d Cir. 1992), the Court of Appeals for the Second Circuit held that dismissal of a Connecticut criminal prosecution under its "accelerated pretrial rehabilitation" program was not sufficiently favorable to support a § 1983 malicious prosecution claim.[12] The court reasoned that permitting "a criminal

---

[11]*See Nardini v. Hackett*, 2001 WL 1175130, at *4 (E.D. Pa. Sept. 19, 2001) (holding ARD program not a termination favorable to plaintiff for purposes of bringing a § 1983 malicious prosecution claim); *Davis v. Chubb/Pac. Indem. Group*, 493 F. Supp. 89, 92 (D.C. Pa. 1980) ("an A.R.D. disposition . . . [is not] a favorable termination"); *but see Williams v. Borough of Norristown*, 1995 WL 422684, at *1 n.3 (E.D. Pa. July 11, 1995) (declining to dismiss § 1983 malicious prosecution claim where underlying criminal charge was resolved through ARD, noting "lack of Third Circuit authority on the issue").

[12]Connecticut's "accelerated pretrial rehabilitation" program is similar to Pennsylvania's ARD program. Conn. Gen. Stat.

26

defendant to maintain a section 1983 action after taking advantage of accelerated rehabilitation, the program, intended to give first-time offenders a second chance, would become less desirable for the State to retain and less desirable for the courts to use because the savings in resources from dismissing the criminal proceeding would be consumed in resolving the constitutional claims." *Id*. at 853.

*Roesch* relied upon *Singleton v. City of New York*, 632 F.2d 185, 193-95 (2d Cir. 1980). In *Singleton*, the court considered a mechanism under New York Criminal Procedure similar to the ARD program, termed "adjournment in contemplation of dismissal." *See* N.Y. Crim. Proc. Law § 170.55. Under an adjournment in contemplation of dismissal, after the accused serves a probationary period, the charges are dismissed. The court likened the adjournment in contemplation of dismissal to a consent decree, reasoning that both leave open the question of guilt. *Id*. at 193. But the court refused to equate dismissal with acquittal. *Id*. The court found significance in the probationary period, calling it an unfavorable "period of observation . . . to determine whether the prosecutor's acquiescence in the adjournment was justified." *Id*. at 194.

---

Ann. § 54-56e (West Supp. 1992). To earn dismissal of the charges and erasure of related records under Connecticut's program, the defendant must successfully complete a probationary period and pay to the court a one hundred dollar "participation fee."

Regarding expungement of the records related to the charge, the court found this erased "the stigma that might otherwise be borne by the defendant," in the same way laws treat juvenile delinquents who have committed criminal acts, but does not constitute a finding of "not guilty." *Id*.

In *Taylor v. Gregg*, 36 F.3d 453, 455-56 (5th Cir. 1994), the Court of Appeals for the Fifth Circuit adopted *Singleton*'s reasoning, holding that a "pre-trial diversion order" is not a favorable termination. Like the ARD program, offenders who successfully complete Texas' diversion program receive dismissal of their charges. The court held that "criminal defendants are effectively foregoing their potential malicious prosecution suit in exchange for conditional dismissal of their criminal charges." *Id*. at 456.

The ARD program is a court-supervised compromise. *See Davis*, 493 F. Supp. at 92; *see also Commonwealth v. Kindness*, 371 A.2d 1346 (Pa. Super. Ct. 1977) (describing termination of criminal charge under ARD program as a court-supervised compromise). Nevertheless, the ARD program imposes several burdens upon the criminal defendant not consistent with innocence, including a probationary term, "restitution . . . imposition of costs, and imposition of a reasonable charge relating to the expense of administering the program, and such other conditions as may be agreed to by the parties." Pa. R. Crim. P. 316(a). We agree with *Singleton* that probation constitutes an "unfavorable" period of judicially imposed limitations on freedom in which the probationer's

28

violation of the program's terms may result in criminal prosecution. *Singleton,* 632 F.2d at 193-95. Viewing these factors together, we hold the ARD program is not a favorable termination under *Heck*.[13] Petit's participation in the ARD program bars his § 1983 claim.[14]

---

[13]The strongest factor supporting the contention that ARD is a favorable termination is that successful completion of the ARD program results in dismissal of the criminal charge and expungement of the arrest record. *See* Pa. R. Crim. P. 319, 320. For the reasons noted, however, we believe the ARD program is not a favorable termination under *Heck*.

[14]The District Court suggested that even if *Heck* did not bar Petit's claim, the First Amendment claim would fail nonetheless because videotaping does not constitute a protected First Amendment activity. But videotaping or photographing the police in the performance of their duties on public property may be a protected activity. *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."). More generally, photography or videography that has a communicative or expressive purpose enjoys some First Amendment protection. S*ee generally Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996) (holding that sale of art and photographs are protected activities); *Porat v. Lincoln Towers Cmty. Ass'n*, 2005 WL 646093, at *4 (S.D.N.Y. Mar. 21, 2005)

## Conclusion

For the foregoing reasons, we will affirm the District Court's grant of summary judgment dismissing Gilles' and Petit's claims.


Fuentes, *Circuit Judge*, dissenting in part.


I disagree with the majority that the police officers who arrested Gilles, who was speaking in an open space at a public university, and whose speech was not likely to result in a breach of the peace, are entitled to qualified immunity. The officer who arrested Gilles observed no conduct that amounted to a breach of the peace.


I also disagree that Petit's First Amendment claim should be dismissed under Heck v. Humphrey, 512 U.S. 477 (1994), because, under Heck and Spencer v. Kemna, 523 U.S. 1 (1998), Heck's favorable termination rule cannot be applied to dismiss

---

(noting that photography for more than mere aesthetic or recreational purposes enjoys some First Amendment protection); *Baker v. City of New York,* 2002 U.S. Dist LEXIS 18100, at *19 (S.D.N.Y. Sept. 25, 2002) ("It is undisputed that [plaintiff's] street photography is First Amendment expression[.]").

a § 1983 claim brought by a plaintiff not in custody.  Id. at 500.
I join in the remainder of the majority's opinion.[15]


## I. Gilles' Arrest


## A. First Amendment violation


The essence of the majority opinion is that, though defendants may have violated Gilles' First Amendment rights, the law was not so clearly established as to deprive the officers of qualified immunity.  I disagree because I believe that the officers violated long-standing, fundamental principles of First Amendment law.

---

[15]I join in the majority's opinion with respect to Gilles' challenge of the Indiana University of Pennsylvania (IUP) permit policy.  I merely wish to add that Gilles has no standing to bring his challenge because the permit policy is a reasonable, content-neutral policy that regulates commercial solicitation only, and therefore Gilles raises no issue with respect to whether the permit policy "may cause others not before the court to refrain from constitutionally protected speech or expression." Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973).

To qualify as fighting words, speech must either be intended and likely to incite violence, or inherently likely to result in physical fighting. See Cohen v. California, 403 U.S. 15, 20 (1971) ("There is . . . no showing that anyone who saw Cohen was in fact violently aroused or that appellant intended such a result."); Texas v. Johnson, 491 U.S. 397, 409 (1989) ("asking whether the expression is directed to inciting or producing imminent lawless action and is likely to incite or produce such action") (internal quotation omitted); Johnson v. Campbell, 332 F.3d 199, 213 (3d Cir. 2003) ("Johnson's words were unpleasant, insulting, and possibly unwise, but they were not intended to, nor did they, cause a fight.").[16]

Here there is no indication, and certainly no showing, that Gilles acted with the intention of provoking violence. Therefore, we must consider whether the speech was by its nature very likely to result in physical fighting. Defendants argue that the crowd which had gathered before Gilles was on the verge of riot when police officers arrived. I do not discern, from what little we can observe on the videotape on record, that the crowd was on the verge of riot. As the state court, which granted a writ of habeas corpus to Gilles, noted, many listeners

---

[16]Speech that results in violence is not necessarily inherently provocative, but in the absence of violence or any sign of impending violence it is especially difficult to show that certain words 'inherently' arouse listeners to violence.

32

reacted to Gilles' speech "by being quietly attentive or simply laughing at the proceedings." Besides Gilles himself, the only noise comes from individuals in the crowd shouting at Gilles and engaging in various heated exchanges with him. The crowd occasionally broke out into applause in their support.

In the videotape, Gilles stands near a tree at a pedestrian intersection on a campus green. The only other people one can see for most of the tape are those passing by him on the pedestrian walkway. The crowd listening and engaging Gilles is some distance away from him, as there is considerable empty space visible around Gilles. As the majority describes the scene, at one point, one individual approached Gilles to confront him, but that individual remained only briefly. Gilles called him "cigarette-breath" as he walked away. As the majority notes, the records suggests that at some point someone also threw an apple that hit Gilles' briefcase, but this event is hardly noticeable on the tape and was hardly an act of physical intimidation.

The record does suggest that the police were told that the situation was "near riot" and that a fight might break out. However, I think it is clear that no fight was actually likely to break out. The students were certainly angry with Gilles and wanted him off their campus, but there is no indication that they intended to force him off of the campus physically.

The police defendants were probably concerned upon arriving at the scene that angry people were shouting at each other and engaging in some name-calling. But "the First Amendment recognizes . . . that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive." City of Houston v. Hill, 482 U.S. 451, 472 (1987). While "[t]o many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance[, t]hese are . . . in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve." Cohen, 403 U.S. at 24-25.

Indeed, in this case, Gilles provoked exactly the response desirable in a democracy: students responded to him by engaging in argument regarding important issues of religious and sexual tolerance and personal privacy.

Defendants argue that however benign the crowd's behavior up until the time that Gilles was arrested, his language was so provocative that it was reasonable to assume that at some point violence would break out. It is very difficult to show, however, that words are inherently "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." Hill, 482 U.S. at 461 (quoting Terminiello v. Chicago, 337 U.S. 1, 4 (1949)); see

34

also Street v. New York, 394 U.S. 576, 592 (1969) ("Though it is conceivable that some listeners might have been moved to retaliate upon hearing appellant's disrespectful words, we cannot say that appellant's remarks were so inherently inflammatory as to come within the small class of 'fighting words' which are likely to provoke the average person to retaliation.") (internal quotation omitted).

The Supreme Court has long rejected the presumption that "an audience that takes serious offense at particular expression is necessarily likely to disturb the peace and that the expression may be prohibited on this basis . . . . On the contrary . . . a principal function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Texas v. Johnson, 491 U.S. at 408-09 (internal quotation omitted). The Court has explicitly held that it will "not permit[] the government to assume that every expression of a provocative idea will incite a riot, but [has] instead required careful consideration of the actual circumstances surrounding such expression." Id. at 409. The government in this case was not justified in presuming that university students, whose peculiar vocation it is to engage in free and open debate, "are standing ready to strike out physically at whomever may assault their sensibilities" so as to effectively censor dissidents. Cohen, 403 U.S. at 23. As the Cohen court explained:

[While] [t]here may be some persons about with such lawless and violent proclivities . . . that is an insufficient base upon which to erect, consistently with constitutional values, a governmental power to force persons who wish to ventilate their dissident views into avoiding particular forms of expression. The argument amounts to little more than the self-defeating proposition that to avoid physical censorship of one who has not sought to provide such a response by a hypothetical coterie of the violent and the lawless, the States may more appropriately effectuate that censorship themselves.

Id. at 23.

The force of the defendant's attempt to characterize Gilles' speech as "fighting words" derives almost entirely from the offensive character of his speech. Cf. Street, 394 U.S. at 592 ("[A]ny shock effect of appellant's speech must be attributed to the content of the ideas expressed. It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."). Yet Ku Klux Klan members and neo-Nazis are permitted to march, notwithstanding the offense they cause to the vast majority of people. See Texas v. Johnson, 491 U.S. at 418 ("The First Amendment does not guarantee that . . . concepts virtually sacred to our Nation as a whole . . . will go

36

unquestioned in the marketplace of ideas.") (citing Brandenburg v. Ohio, 395 U.S. 444 (1969)). "[W]e are often captives outsides the sanctuary of the home and subject to objectionable speech." Cohen, 403 U.S. at 21 (quotation omitted). People who do not want exposure to the offensive speech can avert their eyes or walk away. Id. at 21. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. at 414. Neither embarrassing, disgraceful, shaming, vulgar nor offensive words are inherently fighting words. See Lewis, 415 U.S. 133-34; NAACP v. Claiborne Hardware Co., 458 U.S. 886, 910, 911 (1982); Gooding, 405 U.S. at 527; Campbell, 332 F.3d at 212.

The majority suggests that at least those insults that Gilles directed at a woman who identified herself as Christian and lesbian were fighting words. Gilles taunted the woman: "oh, my, you ma'am are most confused. She thinks she's a Christian lesbo. She's a lesbian for Jesus." He asked her, "do you lay down with dogs? Are you a bestiality lover? . . . Can you be a bestiality lover and a Christian also?"

The government's constitutional authority "to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are

37

being invaded in an essentially intolerable manner." <u>Cohen</u>, 403 U.S. at 21. Although outrageous and offensive, Gilles' comments to this woman were made in the context of a speech in which he alleged that most Indiana University of Pennsylvania ("IUP") students were going to hell for their sexual degeneracy. The students he called out specifically, including the woman who identified herself as a Christian lesbian, were among those who chose to shout back at Gilles and engage him. Gilles clearly had no independent knowledge of any of these students, such that they could feel he was "revealing" actual information about their private lives. Gilles was clearly using them as mere examples of his larger point about campus sexual mores.

Because Gilles was not directing his comments to individuals in any meaningful sense, they are especially difficult to characterize as "fighting words." "Fighting words" are "directed to the person of the hearer." <u>Cohen</u>, 403 U.S. at 20 (quotation omitted); <u>see also</u> <u>Hess v. Indiana</u>, 414 U.S. 105, 107-08 (1973); <u>Texas v. Johnson</u>, 491 U.S. at 409. While in this case, several of Gilles' comments were ostensibly directed toward particular individuals in the course of exchanges initiated by them, the alleged personal insults were always delivered from a considerable physical distance and in the course of a sweeping sermon on sexual immorality.

Gilles' speech was provocative because of its content rather than because it contained words to which we would expect university students to react reflexively with violence. Nor were his words directed to individuals under circumstances that would lead the police to conclude that those individuals were likely to fight back physically. Because his speech was unlikely to result in violence, it clearly did not constitute "fighting words." A reasonable officer would know that it fell outside the statutory prohibition against disorderly conduct.

**B. Qualified Immunity**

Notwithstanding the long line of Supreme Court cases cited above, the majority concludes that the officers were not on notice that Gilles' speech was constitutionally protected. To assess a qualified immunity claim, this Court must examine not only "the law that was clearly established at the time of the alleged violation" but also "the facts available to the official at that time." Paff v. Kaltenbach, 204 F.3d 425, 431 (3d Cir. 2000). Contrary to the majority's view, I believe the facts available to the officers at the time that they arrested Gilles and Petit were sufficient to put them on notice of plaintiffs' rights.

Admittedly, when officers Davis and Goemmer arrived at the scene they had to rely on their observations and the reports of witnesses. The incident report suggests that most officers' assessment of the situation was based primarily on the initial

report of a possible fight and their observation of Gilles shouting inflammatory language at the crowd. As explained above, the officers could not infer the prospect of violence from the content of Gilles' speech alone. Nor was it reasonable to rely on the initial report of a possible fight even after arriving at the scene and observing a purely verbal engagement. Although Officer Davis reports that he asked members of the crowd what was happening and spoke to one witness who identified herself as someone specifically affected by Gilles' remarks, the short time that passed between the officers' arrival at the scene and their arrest of Gilles suggests this questioning could not have been thorough. Moreover, the officers should have known that the only language remotely approaching fighting words was unlikely to result in lawlessness because those who allegedly had been attacked volunteered for an interview with the officers. Having just identified themselves to the police, these individuals were unlikely to strike out at Gilles in the officers' presence. In these circumstances, the officers acted too quickly in arresting Gilles shortly after they arrived at the scene. Nothing they saw or heard in that brief time justified his arrest.

Even if the officers had a reasonable basis for believing that a breach of the peace might eventually occur, their concern could not justify a quick arrest. If the officers were worried that one or more students might physically assault Gilles, the appropriate response would have been to stand guard to ensure that no violence erupted. Their mere presence should have been

40

enough to deter a breach of the peace. It was not reasonable for the officers instead to ask Gilles for a permit he did not need and then to arrest him.

## III. Petit's First Amendment Claim

I disagree with the majority's view that the District Court properly dismissed Petit's claim under Heck v. Humphrey, 512 U.S. 477 (1994).[17] Heck extended the common law principle that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments . . . to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement." Id. at 486.

---

[17]Because Petit's claims are not barred under Heck, the District Court should have addressed the merits of his First Amendment claim and engaged in a qualified immunity analysis with respect to his arrest. As the majority points out, the District Court was wrong to suggest that Petit's claim would fail merely because he did not literally speak; videotaping can constitute protected expression. See Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest.").

41

Like the District Court, the majority assumes that the favorable termination rule in <u>Heck</u> applies to Petit's claim. But because Petit was not in custody when he filed his § 1983 action, <u>Heck</u> does not apply to his claims. Under the best reading of <u>Heck</u> and <u>Spencer v. Kemna</u>, 523 U.S. 1 (1998), the favorable termination rule does not apply where habeas relief is unavailable.

Justice Souter explained this construction of the rule in his concurrence in <u>Heck</u>:

[T]he alternative would needlessly place at risk the rights of those outside the intersection of § 1983 and the habeas statute, individuals not 'in custody' for habeas purposes. If these individuals (people who were merely fined, for example, or who have completed short terms of imprisonment, probation, or parole, or who discover (through no fault of their own) a constitutional violation after full expiration of their sentences), like state prisoners, were required to show the prior invalidation of their convictions or sentences in order to obtain § 1983 damages for unconstitutional conviction or imprisonment, the result would be to deny any federal forum for claiming a deprivation of federal rights to those who cannot first obtain a favorable state ruling. The reason, of course, is that individual not 'in custody' cannot invoke federal

habeas jurisdiction, the only statutory mechanism besides § 1983 by which individuals may sue state officials in federal court for violating federal rights. That would be an untoward result.

Id. at 500 (Souter, J., concurring).

Justice Souter pointed out that courts lack authority to subvert the "plain language" of § 1983 on the basis of a common law principle limiting collateral attack, especially where it "would run counter to §1983's history and defeat the statute's purpose." Id. at 501 (Souter, J., concurring) (internal quotation omitted).

Justice Souter reiterated in his concurrence in Spencer that "Heck did not hold that a released prisoner in Spencer's circumstances is out of court on a § 1983 claim, and . . . it would be unsound to read either Heck or the habeas statute as requiring any such result." Spencer, 523 U.S. at 989 (Souter, J., concurring). He concluded instead that under a better reading of Heck, a prisoner who was no longer in custody, or who had never entered custody, "may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable termination requirement that it would be impossible as a matter of law for him to satisfy." Id. at 990 (Souter, J., concurring).

43

Justice Souter's concurrence in <u>Spencer</u> was joined by Justices O'Connor, Ginsburg, and Breyer. Justice Stevens dissented but indicated that "it is perfectly clear, as Justice Souter explains, that [a petitioner who does not have a remedy under the habeas statute] may bring an action under 42 U.S.C. § 1983.". <u>Id.</u> at 992 n.8 (Stevens, J., concurring). Thus, a majority of the <u>Spencer</u> Court favored Justice Souter's reading of <u>Heck</u>.[18]

This Court addressed a related issue in <u>Torres v. Fauver</u>, 292 F.3d 141 (3d Cir. 2002). In <u>Torres</u>, we held that "the favorable termination rule does not apply to claims that implicate only the conditions, and not the fact or duration, of a prisoner's incarceration." <u>Id.</u> at 143. We observed that Torres' § 1983 claim was cognizable unless the favorable termination applies to "prison disciplinary sanctions that do not affect the fact or length of a prisoner's confinement, and, more generally . . . persons who cannot seek habeas relief." <u>Id.</u> at 145. Because the Court found that the rule does not apply to sanctions that affect only the conditions of confinement, we did not reach the broader question of whether all those who cannot seek habeas relief are exempt from the favorable termination rule. <u>Id.</u> However, in a lengthy footnote, this Court pointed out that, after <u>Spencer</u>, a majority of

[18]The opinions of the Court in both <u>Heck</u> and <u>Spencer</u> do suggest in passing that Justice Scalia would not similarly limit the application of the favorable termination rule. <u>See</u> <u>Spencer</u>, 523 U.S. at 988; <u>Heck</u>, 512 U.S. at 490 n.10.

44

the Supreme Court appears to support the broader exemption and, in a shorter footnote, we approvingly cited Justice Souter's reading of Heck. Torres, 292 F.3d at 145 n.5, 147 n.8.

Other circuits, too, lean toward the more narrow construction of the favorable termination rule. In Jenkins v. Haubert, the Second Circuit held that a prisoner may bring a § 1983 claim "challenging the conditions of his confinement where the prisoner is unable to challenge the conditions through a petition for federal habeas corpus." 179 F.3d 19, 21 (2d Cir. 1999); see also Leather v. Eyck, 180 F.3d 420, 424 (2d Cir. 1999) (holding that favorable termination rule did not apply to a defendant who "is not and never was in the custody of the State" because "he . . . has no remedy in habeas corpus"). The Seventh Circuit agreed, indicating that it too is "hesitant to apply the Heck rule in such a way as would contravene the pronouncement of five sitting Justices." Dewalt v. Carter, 224 F.3d 607, 616-17 (7th Cir. 2000) (citation omitted). Finally, the Ninth Circuit also has indicated it will apply the narrower favorable termination rule. See Ramirez v. Galaza, 334 F.3d 850, 858 (9th Cir. 2003) (holding Heck does not apply to § 1983 suits challenging constitutional errors which "do[] not affect the overall length of the prisoner's confinement" because even if successful they "would not necessarily result in an earlier release from

45

incarceration, and hence, do[] not intrude upon the 'heart of habeas jurisdiction.'").[19]

Justice Souter's interpretation of the favorable termination rule is thus not only the better view, but also was the majority view of the Spencer Court and is the view among several courts of appeal. Accordingly, I believe the District Court erred when it applied Heck without considering whether Petit could have brought his claim under habeas, and if not, whether that placed him outside the scope of the favorable termination rule.

The majority bases its reasoning on three cases, two of which pre-date Heck. See Taylor v. Gregg, 36 F.3d 453 (5th Cir. 1994); Roesch v. Otarola, 980 F.2d 850 (2d Cir. 1992); Singleton v. City of New York, 632 F.2d 185 (2d Cir. 1980). In all three cases, however, the favorable termination rule arose only because plaintiffs brought suits for malicious prosecution. Favorable termination was an element of the common law tort of malicious prosecution long before Heck extended it to certain other § 1983 claims. See 512 U.S. at 584. Accordingly, the favorable

_____

[19]Two circuits have rejected the more narrow reading of the favorable termination rule. See Randell v. Johnson, 227 F.3d 300, 301 (5th Cir. 2000); Figueroa v. Rivera, 147 F.3d 77, 81 n.3 (1st Cir. 1998). For the reasons given, I think their reading of Heck and Spencer is not persuasive.

46

termination rule indisputably applies to all claims of malicious prosecution regardless of whether habeas relief is available. But that fact clearly does not imply that the rule applies to all other § 1983 claims. Heck applies the rule to only those cases which, if successful, would render invalid a "conviction or sentence." Id. at 486. While Heck extended the scope of the favorable termination rule in order to reconcile § 1983 with the federal habeas statute, § 1983 claims which cannot otherwise be pursued in a habeas petition are not subject to the rule. The cases on which the majority relies do not suggest otherwise.

I now turn to the critical question on this point: whether Petit could have brought a habeas petition instead of the present § 1983 action. The duration of Petit's ARD program is not on record, but it could not have exceeded two years. See Pa. R. Crim. P. 316(B). Since Petit filed suit about one and a half years after his arrest, his ARD program was likely completed before he brought this suit. Thus, Petit could not have pursued habeas relief. See Carafas v. LaVallee, 391 U.S. 234, 238-40 (1968) (holding that in making a custody determination, a court looks to the date that the habeas petition was filed).

Even if the ARD program was not complete when Petit initiated the instant action, based on my review of the record, I conclude that the ARD program never placed Petit "in custody" for habeas purposes. ARD is a pre-trial diversionary program, the

47

purpose of which "is to attempt to rehabilitate the defendant without resort to a trial and ensuing conviction." Commonwealth v. Feagley, 538 A.2d 895, 897 (Pa. Super. Ct. 1988) (refusing to hear appeal from order terminating participation in ARD). "[A]cceptance of ARD does not constitute a conviction" and "is not the equivalent of a conviction." Id. at 897.

Although we do not know the precise conditions imposed upon Petit, they do not appear to have required Petit to report anywhere in Pennsylvania since his stated reason for entering ARD was to enable his return to Kentucky as quickly as possible for work. Cf. Dow v. Cir. Ct. of First Cir. Through Huddy, 995 F.2d 922, 923 (9th Cir. 1993) (holding alcohol rehabilitation program that required defendant's physical presence at a particular place significantly restrained his liberty and could be characterized as custody for habeas purposes). While Pennsylvania Rule of Criminal Procedure 316 provides that "[t]he condition of [the ARD program] may be such as may be imposed with respect to probation after conviction of a crime," the conditions of Petit's ARD program did not approach the normal conditions of parole. Cf. Jones v. Cunningham, 371 U.S. 236, 242-43 (1963) (holding individual confined by parole order to particular community, house, and job at the sufferance of his parole officer, who is under constant threat of reincarceration, qualified as "in custody" for habeas purposes).

48

I therefore conclude that, even in the unlikely event that Petit was still in ARD at the time that he filed the present suit, his ARD program was not sufficiently burdensome to render him "in custody" for habeas purposes. Accordingly, the favorable termination rule does not apply to his claims and the dismissal of his claim on that basis was error.